FILED
2012 Aug-29  PM 01:06
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | | |
|---|---|---|
| **EARL PATRICK as Administrator** | ) | |
| **and Personnel Representative of the** | ) | |
| **Estate of Clyde Patrick,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 2:09-CV-1825-VEH** |
| | ) | |
| **CITY OF BIRMINGHAM, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

---

## MEMORANDUM OPINION AND ORDER

## I.    INTRODUCTION AND PROCEDURAL HISTORY

Plaintiff Earl Patrick (the "Administrator") initiated this civil rights case on August 1, 2009, as the administrator and personal representative of the estate of Clyde Patrick ("Mr. Patrick") against Defendants City of Birmingham ("COB"), Chief of Police Annetta Nunn ("COP Nunn"), and Chief of Police A.C. Roper ("COP Roper"),[1] in the Circuit Court of Jefferson County, Alabama.  (Doc. 1 at Ex. 1 at 1). On September 14, 2009, Defendants removed the lawsuit to this court on the basis of federal question and civil rights jurisdiction.  (Doc. 1 ¶ 4 ("Because plaintiff alleges

---

[1]  The Administrator subsequently amended his complaint and sued additional defendants.  (Doc. 35).

claims arising under a law of the United States, United States District Courts have original jurisdiction of this action under 28 U.S.C. § 1331 and 1343.")).

According to the Administrator's second amended complaint (Doc. 35) and previous rulings by this court, the following five claims remain pending:  (1) count IV for deliberate indifference against the COB; (2) count V for deliberate indifference against COP Nunn; (3) count VI for unlawful search and seizure against the COB; (4) count X for unlawful search and seizure against Gregory Everett ("Officer Everett"), Scott Hastings ("Officer Hastings"), Emerson Oldham ("Officer Oldham"), Joe Roberts ("Officer Roberts"), and Karl Wilson ("Officer Wilson") (collectively, the "Officer Defendants"); and (5) count XI for excessive force against the Officer Defendants.[2]

Pending before the court are three motions:  (1) the Motion for Summary Judgment filed by the COB, COP Nunn, and Officers  Hastings, Oldham, Roberts, and Wilson (collectively, "COB's Motion")[3] on April 27, 2012; (2) the Motion for Summary Judgment (Doc. 111) filed by Officer Everett on May 1, 2012 ("Officer

---

[2]  As the court understands the Administrator's claims, COP Nunn has been sued both officially and individually, while Officers Everett, Hastings, Oldham, Roberts, and Wilson are being sued only in their individual capacities.

[3]  Originally, COP Roper joined in the filing of COB's Motion, but the Administrator subsequently sought to dismiss all counts (III and IX) that named him as a party, which the court did on August 16, 2012.  (Doc. 124).

Everett's Motion"); and (3) the Motion To Strike Certain Language from the Defendants' Reply Briefs (Doc. 121) (the "Administrator's Strike Motion") filed on June 22, 2012.

The parties have filed their evidence and briefs in support of and opposition to these motions (Docs. 110, 112, 115-18, 122), and they are all now under submission. For the reasons explained below, COB's Motion is **GRANTED IN PART** and **DENIED IN PART**, Officer Everett's Motion is **GRANTED IN PART** and **DENIED IN PART**, and the Administrator's Strike Motion is **GRANTED**.

## II.   FACTUAL BACKGROUND[4]

### A.   Initial Incident Involving Mr. Patrick

On August 2, 2007, several officers with the COB responded to a call coming from a location of 2841 42nd Avenue North in Birmingham.  AF No. 3.1.[5]   More

---

[4]  Keeping in mind that when deciding a motion for summary judgment the court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion, the court provides the following factual background. *See Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.*, 496 F.3d 1231, 1241 (11th Cir. 2007) (observing that, in connection with summary judgment, a court must review all facts and inferences in a light most favorable to the non-moving party). This statement does not represent actual findings of fact.  *See In re Celotex Corp.*, 487 F.3d 1320, 1328 (11th Cir. 2007).  Instead, the court has provided this statement simply to place the court's legal analysis in the context of this particular case or controversy.

[5]  "AF" stands for admitted fact and indicates a fact offered in the brief in the support of the COB's Motion (Doc. 110 at 3-8) that the Administrator has admitted

specifically, the officers received a report that a black man had just jumped into Takela Gaines's ("Ms. Gaines") vehicle.  AF No. 3.2.

Ms. Gaines stated that her keys were still in the ignition of her automobile and that the engine was running.  AF No. 3.3.  Ms. Gaines also indicated that the suspect was naked and that she was afraid.  AF No. 3.4.

COB officers in Units 120 and 132 arrived on the scene and identified the black male as Mr. Patrick.  AF No. 4.1.  The responding officers then requested that an ambulance transport Mr. Patrick to UAB Hospital.  AF No. 4.2.

Birmingham Fire and Rescue Unit #13, Lt. Orlando Reynolds ("Lt. Reynolds"), was dispatched to the location on a mental patient call.  AF No. 5.1.  When Lt. Reynolds arrived on the scene, he noticed a black male standing in the yard holding a piece of foam.  AF No. 5.2.

Lt. Reynolds recalled that two COB officers were already on the scene.  AF No. 5.3.  Lt. Reynolds reported that Mr. Patrick seemed confused such that when asked a question, his responses failed to correspond to the questions or to otherwise make

_____

in opposing summary judgment.  (Doc. 115 at 2).  A number following a decimal point corresponds to the particular sentence within the numbered statement of facts. For example, (AF No. 3.2) would indicate the second sentence of paragraph 3 of the "Statement of the Case" set forth in Doc. 110 is the subject of the court's citation to the record.  "AAF" stands for additional admitted fact and indicates a fact offered by the Administrator in opposition to summary judgment (Doc. 115 at 4-10) that Defendants have admitted on reply.  (Doc. 117 at 2-4).

sense.  AF No. 5.4.  Lt. Reynolds stated that Mr. Patrick was subsequently transported to UAB Hospital.  AF No. 5.5.

**B.      Fatal Incident Involving Mr. Patrick**

Later, in the afternoon of August 2, 2007, Birmingham and UAB Police were called to the vicinity of the UAB Hospital emergency room about a mentally disturbed person.  AF No. 6.1.  The initial call went out as a 78 (mentally disturbed subject) by COB North Precinct Officers Marcus Robinson (3316) and Desmond Gray (3157).  AF No. 6.2.

Officers Robinson and Gray stated that they were working unit 798 (Hi-Cop car) when they rode up on a black male standing in the street causing a scene in the 300 block of 19th Street South.  AF No. 6.3.  Officers Robinson and Gray notified the dispatcher of their location and the clothing and physical description of the suspect, and requested a South Precinct unit to assist them with the subject.  AF No. 6.4.

South Precinct Unit 322 (Officer Noel Hall and Officer Wilson, a named defendant) arrived on the scene to assist and advised they would take over the call. AF No. 7.1.  Officers Robinson and Gray stated that the suspect was calm and fully dressed before they left, but they also heard the suspect say, "Y'all can go ahead and shoot me, go ahead and pour gasoline on me!"  AF No. 7.2.

When Officers Hall and Wilson arrived on the scene, Captain James Tingle

5

("Captain Tingle") of Birmingham Fire and Rescue was there as were two officers, who were standing on the sidewalk taking with the subject. AF No. 8.1. The senior officer advised that they had found the patient on 19th Street standing with his hands over his head. AF No. 8.2. Upon interviewing the subject, it was discovered that he was Mr. Patrick. AF No. 8.3.

When questioned about what was wrong, Mr. Patrick stated that he did not need medical aid; instead, he just needed some water to drink. AF No. 8.4. Captain Tingle asked Mr. Patrick about his medical history. AF No. 8.5. Mr. Patrick indicated he had a history of diabetes, hypertension, and an issue with anxiety. AF No. 8.6.

Mr. Patrick further stated he had been in UAB Hospital earlier that day and had left. AF No. 8.7. Specifically, he stated that he had gone to UAB Hospital because he did not have any medication. AF No. 8.8. Mr. Patrick never stated definitively when or why he had decided to leave the hospital; he would begin making explanations but never quite completed his thoughts. AF No. 8.9. Mr. Patrick did state that he did not want to go back to the hospital. AF No. 8.10.

Mr. Patrick presented with diaphoresis, *i.e.*, excessive sweating. AF No. 9.1. Mr. Patrick would have brief periods of anxiety followed by periods where he was relatively calm. AF No. 9.2. Mr. Patrick consented to the taking of his vital signs

6

and allowed the paramedics to perform a d-stick reading (*i.e.*, for measuring blood glucose levels) on him.  AF No. 9.3.  His vitals were within acceptable parameters, as was his d-stick reading.  AF No. 9.4.

Mr. Patrick then asked if the paramedics had any water.  AF No. 9.5. Captain Tingle stated that they did have water available, at which time Mr. Patrick asked if he could have a drink, stating he had not had anything to eat or drink all day.  AF No. 9.6.  Captain Tingle was convinced Mr. Patrick would not consent to being transported back to the hospital.  AF No. 9.7.

Mr. Patrick then drank a few cups of water over a span of a few minutes.  AF No. 9.8.  After Mr. Patrick had some water and cooled off, his disposition seemed to improve.  AF No. 9.9.  Captain Tingle then asked Mr. Patrick if he would allow them to transport him back to UAB.  AF No. 9.10.

A COB rescue unit arrived on the scene.  AF 11.1.  Captain Tingle did a pass-on regarding the patient/event history.  AF No. 11.2.  Personnel from the rescue unit approached Mr. Patrick, who began to decline transport and appeared to be anxious.  AF Nos. 11.3, 11.4.  An effort was made to persuade Mr. Patrick to consent to transport.  AF No. 11.5.

It was a very hot day and Mr. Patrick was sweating very badly.  AF No. 12.1. At times, Mr. Patrick would be very calm, and other times he would be very anxious.

AF No. 12.2.   Mr. Patrick took off his shirt.  AF No. 12.3.  Captain Tingle recalled that, when attempting to get Mr. Patrick into the rescue truck, Mr. Patrick stated, "I don't want to get in there.  I know what are going to do to me when y'all get me in there."  AF No. 12.4.

After stating his belief that bad things were going to happen to him, Mr. Patrick insisted on riding on the rear bumper of the rescue unit.  AF No. 13.1.  Captain Tingle informed Mr. Patrick that he could not ride on the bumper.  AF No. 13.2.  Captain Tingle then asked Mr. Patrick if he would walk with them to the hospital and Mr. Patrick agreed.  AF No. 13.3.  Captain Tingle stated that in addition to the personnel from the rescue unit there were probably two COB officers with them at this time. AF No. 13.4.  As the rescue authorities started to walk Mr. Patrick to the UAB emergency room near 4th Avenue South, he started to veer toward the street, but they managed to get him back on the sidewalk.  AF No. 13.5.

Mr. Patrick started to get anxious again, and when they got to 5th Avenue South, he started to walk toward the street a second time, so the rescue personnel tried to encourage him again to get on the sidewalk.  AF No. 14.1.  At this point, Captain Tingle asked the COB officers to assist because it had reached a point where he was afraid one of the rescue workers was going to get hurt or someone else was going to get hurt.  AF No. 14.2.  More specifically, Captain Tingle requested that the COB

officers take over the situation and that the rescue personnel pull back from further participation.  AF No. 14.3.

COB officers tried unsuccessfully to subdue Mr. Patrick with Taser guns.  AF No. 16.1.  At some point, Mr. Patrick slipped and fell on the sidewalk and his pants came off, exposing his genitalia.  AF No. 16.2.  The Officer Defendants collectively fired a total of 18 shots from their Taser weapons at Mr. Patrick over a period of less than 11 minutes.  (Doc. 115 at 7 ¶ 21).

Subsequent to the series of shots from multiple stun guns fired by the five Officer Defendants, Mr. Patrick eventually died.  The Jefferson County Coroner concluded that Mr. Clyde died, by homicide, from "[p]robable arrhythmia secondary to dilated cardiomyopathy" and that Taser use was a contributory cause in his death. (Doc. 116-8 at 2 at 0001).

## C.    Other Pertinent Facts

The Officer Defendants received training on the use of Tasers and were all certified by Taser International.  AAF No. 2.1; AAF No. 3.  Officer Everett had advanced Taser training and was also a Taser certified training instructor.  AAF No. 4.

As a part of their training, the Officer Defendants were warned about using a Taser against someone exhibiting symptoms of excited delirium or sudden death

syndrome. AAF No. 2.2. Those symptoms include profuse sweating, overheating, bizarre behavior, disorientation, great strength,[6] removal of clothing, and imperviousness to pain. AAF No. 2.3. The Officer Defendants were also trained to handcuff a subject during a Taser's initial five second cycle. AAF No. 1.2.

The Officer Defendants admit that Mr. Patrick was sweating profusely, trying to remove his clothes, appeared to be impervious to pain, and was surprisingly strong. AAF Nos. 6-8. The Officer Defendants further acknowledge with clarification[7] that Mr. Patrick was not intentionally trying to hurt anyone and that he needed help. AAF No. 10.

The Officer Defendants were not arresting Mr. Patrick as a suspect in the commission of a crime. Also, there is no evidence in the record that Mr. Patrick had a criminal history or that the Officer Defendants were under the impression that they were dealing with a known criminal offender or violent subject at the scene.

---

[6] Mr. Patrick was a large man and weighed 306 pounds when he died. (Doc. 116-8 at 2 at 0001).

[7] The same witness, Elisa Jordan ("Ms. Jordan"), who indicated that Mr. Patrick was not intentionally trying to hurt anyone (Doc. 110-4 at 14 at 49), also testified that Mr. Patrick "broke [her] bracelet" and "still had [her] arm because he had [her] in a death grip . . . ." (Doc. 110-4 at 5 at 15; *id.* at 16). Ms. Jordan later clarified in her deposition that when Mr. Patrick was gripping her so intensely, he did so with "[t]he strength [of] hanging on for dear life, [like] you are all I have got." (*Id.* at 7 at 23).

Additionally, no proof appears in the record that Mr. Patrick attempted to flee from the Officer Defendants.  Finally, the video evidence  does not show that the Officer Defendants ever attempted to restrain Mr. Patrick with handcuffs after the first Taser shot impacted him or when he fell to the ground.

## III.   APPLICABLE STANDARDS

### A.      Summary Judgment

Summary judgment is proper only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R . Civ. P. 56(c).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant.  *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  "Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party to 'come forward with specific facts showing that there is a genuine issue for trial.'"  *International Stamp Art, Inc. v. U.S. Postal Service*, 456 F.3d 1270, 1274 (11th Cir. 2006) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

### B.      Qualified Immunity

All  individual  defendants  assert  that  qualified  immunity  bars  the

Administrator's § 1983 claims brought against them in their personal capacities. (Doc. 110 at 26-31; Doc. 112 at 14-19).[8]  "The defense of qualified immunity completely protects government officials performing discretionary functions from suit in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Cottone v. Jenne*, 326 F.3d 1352, 1357 (11th Cir. 2003) (internal quotation marks omitted) (quoting *Gonzalez v. Reno*, 325 F.3d 1228, 1233 (11th Cir. 2003)). "To receive qualified immunity, a government official first must prove that he was acting within his discretionary authority." *Id.*

This is a two-part test.  Under the first step, "the defendant must [prove that he or she was] performing a function that, but for the alleged constitutional infirmity, would have fallen within his legitimate job description." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1266 (11th Cir. 2004).  Next, the defendant must prove that he or she was "executing that job-related function." *Id.* at 1267.  "Once a defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that the defendant is not entitled to qualified immunity."

---

[8]  The page references to this and other documents corresponds with the CM/ECF page numbering.

*Cottone*, 326 F.3d at 1358.[9]

Until 2009, the Supreme Court had required a two-part inquiry to determine the applicability of qualified immunity, as established by *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  Under the *Saucier* test, "[t]he threshold inquiry a court must undertake in a qualified immunity analysis is whether [the] plaintiff's allegations, if true, establish a constitutional violation."  *Hope v. Pelzer*, 536 U.S. 730, 736 (2002).

If, under the plaintiff's allegations, the defendants would have violated a constitutional right, "the next, sequential step is to ask whether the right was clearly established."  *Cottone*, 326 F.3d at 1358 (quoting *Saucier*, 533 U.S. at 201). The "clearly established" requirement is designed to assure that officers have fair notice of the conduct which is proscribed.  *Hope*, 536 U.S. at 739.  This second inquiry ensures "that before they are subjected to suit, officers are on notice their conduct is unlawful."  *Saucier*, 533 U.S. at 206.

The "unlawfulness must be apparent" under preexisting law.[10]  *Anderson v.*

---

[9]  Here, there is no dispute over whether the individual defendants were all acting within the scope of their discretionary authority.

[10]  Only Supreme Court, Eleventh Circuit, and Alabama Supreme Court cases can "clearly establish" the law in this litigation.  *See Thomas v. Roberts*, 323 F.3d 950, 953 (11th Cir. 2003) ("In this circuit, rights are 'clearly established' by decisions of the Supreme Court, this court, or the highest court of the state in which the case arose." (citing *Hamilton v. Cannon*, 80 F.3d 1525, 1532 n.7 (11th Cir. 1996))).

13

*Creighton*, 483 U.S. 635, 640 (1987) (citations omitted). Therefore, a temporal requirement exists related to this inquiry. More particularly, a plaintiff must show that a reasonable public officer would not have believed her actions to be lawful in light of law that was clearly established at the time of the purported violation. *See Anderson*, 483 U.S. at 639 ("[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action[,] assessed in light of the legal rules that were 'clearly established' <u>at the time</u> it was taken[.]") (emphasis added) (citation omitted); *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) ("If the law <u>at that time</u> did not clearly establish that the officer's conduct would violate the Constitution, the officer should not be subject to liability or, indeed, even the burdens of litigation.") (emphasis added); *Brosseau*, 543 U.S. at 198 ("Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law <u>at the time</u> of the conduct.") (emphasis added); *see also Johnson v. Clifton*, 74 F.3d 1087, 1093 (11th Cir. 1996) ("We know of no [preexisting] case which might have clearly told Clifton that he could not take the disciplinary action indicated by an investigation which was initiated before he even knew about the allegedly protected speech, and in circumstances where the public concern implication was doubtful.").

14

However, the *Saucier* framework was made non-mandatory by the Supreme Court in *Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009), in which the Court concluded that, "while the sequence set forth [in *Saucier*] is often appropriate, it should no longer be regarded as mandatory." Thus, "judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.*

Despite the Supreme Court's modification of *Saucier*'s analytical process, the substantive analysis remains unchanged; an officer is entitled to qualified immunity protection as long as he "could have believed" his conduct was lawful. *Hunter v. Bryan*, 502 U.S. 224, 227 (1991). Therefore, to deny immunity, a plaintiff must affirmatively demonstrate that "no reasonable competent officer would have" acted as the public official did. *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

## IV.   ANALYSIS

### A.   Preliminary Considerations

Despite the Administrator's willingness to voluntarily dismiss several counts contained in his second amended complaint, the exact scope of the claims that remain in this lawsuit still lacks clarity. For example, while the Administrator has indicated from a pleadings standpoint that he still is pursuing Counts VI and X for unlawful

15

search and seizure against the COB and the Officer Defendants, respectively, in his

opposition brief, he never mentions either one of these counts, much less provides

any legal analysis of them.  Instead, the focus of the Administrator's responsive brief

is a lack of qualified immunity for the individual Officer Defendants on the excessive

force claim (Doc. 115 at 11-18), a lack of qualified immunity for the individual

Officer Defendants on the deliberate indifference claim (*id.* at 18-19);[11] the COB's

liability (*id.* at 19-20); a lack of state-agent immunity for the individual Officer

Defendants on the Administrator's wrongful death claim (*id.* at 20);[12] and the

Administrator's ability to recover punitive damages from the individual Officer

Defendants.  (*id.* at 20-21).

The Eleventh Circuit has explained the distinction between an excessive force

claim arising out of an illegal stop as opposed to such a claim arising out of a legal

stop:

> As their first theory, Plaintiffs assert that because there was no
> basis for the stop and no governmental interest at stake, any use of force,
> however minimal, was more than reasonably necessary and excessive.

---

[11]  The court notes that no separate count is included in the Administrator's pleading for "deliberate indifference" on the part of the Officer Defendants and treats this section of the opposition brief as additional argument in the area of excessive force.

[12]  The Administrator's complaint does not contain a separate state law claim for wrongful death.

Under this Circuit's law, however, a claim that any force in an illegal stop or arrest is excessive is subsumed in the illegal stop or arrest claim and is not a discrete excessive force claim. *See Williamson v. Mills*, 65 F.3d 155, 158–59 (11th Cir.1995) (holding that a claim that any force during a false arrest is excessive is subsumed in the false arrest claim itself because damages for false arrest include damages for use of force to effect that false arrest). However, as outlined below, a claim for excessive force during a legal stop or arrest is a discrete claim.

*Williamson*'s rule makes sense because if a stop or arrest is illegal, then there is no basis for any threat or any use of force, and an excessive force claim would always arise but only collaterally from the illegal stop or arrest claim. The correct analysis is that the excessive force claim is subsumed in the illegal stop or arrest claim, as recognized in *Williamson*, where a plaintiff contends the force was excessive because there was no basis for any force.

*Jackson v. Sauls*, 206 F.3d 1156, 1170-71 (11th Cir. 2000) (footnote omitted) (emphasis added).

Given the Administrator's silence about the legality of the seizure of Mr. Patrick and the emphasis on the excessive nature of the force employed, including his reliance upon excessive force authorities (as opposed to illegal search opinions),[13] it appears to the court that the Administrator is conceding that the seizure of Mr. Patrick was legally made.

Alternatively, the Administrator has waived his right to pursue an illegal seizure claim because he has offered nothing in opposition to summary judgment to

---

[13] (*See generally* Doc. 115 at 11-18)

substantiate its validity. *See, e.g.*, *Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1322 (11th Cir. 2001) (finding claim abandoned when argument not presented in initial response to motion for summary judgment); *Bute v. Schuller International, Inc.,* 998 F. Supp. 1473, 1477 (N.D. Ga. 1998) (finding unaddressed claim abandoned); *see also Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir. 2000) (failure to brief and argue issue at the district court is sufficient to find the issue has been abandoned); *Resolution Trust Corp. v. Dunmar Corp.,* 43 F.3d 587, 599 (11th Cir. 1995); *Hudson v. Norfolk Southern Ry. Co.,* 209 F. Supp. 2d 1301, 1324 (N.D. Ga. 2001); *cf. McMaster v. United States,* 177 F.3d 936, 940-41 (11th Cir. 1999) (claim may be considered abandoned when district court is presented with no argument concerning a claim included in the plaintiff's complaint); *Road Sprinkler Fitters Local Union No. 669 v. Independent Sprinkler Corp.,* 10 F.3d 1563, 1568 (11th Cir. 1994) (concluding that a district court "could properly treat as abandoned a claim alleged in the complaint but not even raised as a ground for summary judgment").

Thus, consistent with the above reasoning, summary judgment is **GRANTED** on Count VI for unlawful search and seizure against the COB and Count X for unlawful search and seizure against Officers Everett, Hastings, Oldham, Roberts, and Wilson.

**B.      COB's Motion**

   **1.      COB/COP Nunn (Official Capacity)**

The Administrator has sued COP Nunn in both her personal and official

capacities.  As the Eleventh Circuit has explained the distinctions between these two

categories:

> "Personal-capacity suits seek to impose personal liability upon a
> government official for actions he takes under color of state law.
> Official-capacity suits, in contrast, 'generally represent only another way
> of pleading an action against an entity of which an officer is an agent.'"
> *Id.* at 165-66, 105 S. Ct. at 3105 (citations omitted) (quoting *Monell v.*
> *Department of Social Services*, 436 U.S. 658, 690 n. 55, 98 S. Ct. 2018,
> 2035 n. 55-56 L. Ed. 2d 611 (1978)). In other words, a plaintiff in an
> action against a government official in his personal capacity can recover
> only against the official's personal assets. The assets of the
> governmental entity are not accessible. The reverse is true in an official
> capacity lawsuit.  Furthermore, "to establish personal liability in a §
> 1983 action, it is enough to show that the official, acting under color of
> state law, caused the deprivation of a federal right.... [I]n an
> official-capacity suit the entity's 'policy or custom' must have played a
> part in the violation of federal law." *Id.* 473 U.S. at 166, 105 S. Ct. at
> 3105 (citations omitted).

*Yeldell v. Cooper Green Hosp., Inc.*, 956 F.2d 1056, 1060 (11th Cir. 1992) (emphasis

added).  Accordingly, the court analyzes the merits of the Administrator's claims

against COP Nunn in her official capacity under the same framework used to assess

the claims brought against the COB.[14]  The counts at issue in this section are count

---

[14]  Accordingly, any references to COB in this section should also be read to
include COP Nunn in her official role.

IV for deliberate indifference against the COB and count V for deliberate indifference against COP Nunn, officially.[15]

As set forth in the COB's Motion, the Administrator's claims under § 1983 against it are governed by the rules established by the Supreme Court in *Monell v. Department of Social Services*, 436 U.S. 658 (1978).  In order for the COB to be subjected to § 1983 liability, *Monell* requires that the Administrator prove, at a minimum:  (1) that the individual defendants' actions were unconstitutional; and (2) that a municipal "policy" or "custom" of the COB caused these violations to occur. *See, e.g., Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998) ("[A] municipality may be held liable [under section 1983] for the actions of a police officer only when municipal 'official policy' causes a constitutional violation.").

Establishing official municipal policy in the context of challenged police action can arise when the record reflects deficient officer training.  In *City of Canton v. Harris*, 489 U.S. 378, 392 (1989), the Supreme Court acknowledged that "there can be limited circumstances in which an allegation of a 'failure to train' can be the basis for liability in  § 1983," and held that "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to 'deliberate

---

[15]  The allegations set forth in these two counts include references to policy, training, supervision, investigative, autopsy report, apology, and disciplinary failures. (*See* Doc. 35 ¶ 129 a.-h.; *id.* ¶ 131 a.-h.))

indifference' to the rights of persons with the police come into contact."  In other words, the deliberate indifference standard requires a conscious choice on the part of a municipality and the individual shortcomings of a police officer or even the negligent administration of an "otherwise sound program" are insufficient grounds for maintaining a § 1983 municipal claim.  *City of Canton*, 489 U.S. at 390.

Here, in an effort to show § 1983 policy or custom, the Administrator does not mention deliberate indifference or otherwise rely upon the *City of Canton* approach. Instead, the Administrator contends:

> A municipality, by actively endorsing or approving of the conduct of its employees or officials, may be held responsible for it under the theory of ratification.  *See Bannum, Inc. v. City of Ft. Lauderdale*, 901 F.2d 989, 998 (11th Cir. 1990) ("[R]atification by the authorized policymakers of a subordinate's reasoning and decision is chargeable to the municipality because their decision is final." (internal quotations omitted)).  For a plaintiff to succeed on a § 1983 claim against a municipality based on a ratification theory, however, "they must demonstrate that local government policymakers had an opportunity to review the subordinate's decision and agreed with both the decision and the decision's basis...."  *Thomas v. Roberts*, 261 F.3d 1160, 1175 n. 12 (11th Cir. 2001), *vacated on other grounds by*, 536 U.S. 953, 122 S. Ct. 2653, 153 L. Ed. 2d 829 (2002), *reinstated by* 323 F.3d 950 (11th Cir. 2003).
>
> It is undisputed that Annetta Nunn was the policymaker for the police department, had the opportunity to review the investigation of the defendant police officers' homicide, and agreed that those action were within the use of force policy of the police department.

(Doc. 115 at 19-20).

The court has studied the *Bannum* decision, and while the opinion does acknowledge that ratification of a subordinate's decision is a manner in which § 1983 municipal liability may sometimes be established, the context of that case is entirely different than this one.    In particular, *Bannum* does not involve alleged unconstitutional conduct by police officers, but rather concerns a dispute over a zoning decision. *See Bannum*, 901 F.2d at 990 ("Although the Fort Lauderdale zoning authorities initially approved Bannum's operation, this approval subsequently was withdrawn, and Bannum was unable to relocate its supervised residential program in Fort Lauderdale.").

Additionally, the *Bannum* decision turns upon an application of "the guiding principles for determining when a single decision may be sufficient to establish unconstitutional municipal policy under section 1983 . . . ." *Bannum*, 901 F.2d at 997 (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123, 125, 108 S. Ct. 915, 924, 99 L. Ed. 2d 107 (1988)).   Under *Bannum*, one of the guideposts is that "[t]he challenged action must have been taken pursuant to a policy adopted by the official or officials responsible for making policy in that particular area of the city's business, as determined by state law." *Id.*

Unlike *Bannum*, no single decision that later became municipal policy is challenged here.  Instead, the Administrator is objecting to the results of COP Nunn's

22

investigation into the death of Mr. Patrick. Furthermore, the Administrator has not pointed to and the court is unaware of any binding authority in which the framework used in *Bannum* has been extended to encompass a review of police action by a chief of police as sufficient conduct to establish municipal policy on the basis of ratification.

Finally, the Administrator offers no basis as an alternative to *Bannum* upon which to link the police conduct to municipal policy. Therefore, the court finds that Administrator's efforts to show evidence of an actionable municipal policy or custom in response to the COB's Motion are inadequate. Accordingly, the COP's Motion is **GRANTED** with respect to count IV and the official capacity component of count V of the second amended complaint.

### 2.      COP Nunn (Personal Capacity)

To the extent that the Administrator seeks to impose personal liability against COP Nunn for her actions in count V, summary judgment is also **GRANTED** on the grounds of qualified immunity. In particular, the Administrator has not shown how COP Nunn's actions regarding the investigation into the death of Mr. Patrick were unconstitutional, *see Saucier*, 533 U.S. at 201, 121 S. Ct. at 2156 ("Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"), much less, in violation of clearly

established law. *Id.* ("On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established.").

In fact, the court fails to see where the Administrator has offered any evidence or legal authority in support of an individual claim against COP Nunn based upon her investigation into the police conduct leading up to Mr. Patrick's death. Under such circumstances, this court is under no obligation to address the Administrator's perfunctory and underdeveloped attempt to impose personal liability upon COP Nunn. *See Flanigan's Enters., Inc. v. Fulton County, Ga.*, 242 F.3d 976, 987 n.16 (11th Cir. 2001) (holding that a party waives an argument if the party "fail[s] to elaborate or provide any citation of authority in support" of the argument); *Ordower v. Feldman*, 826 F.2d 1569, 1576 (7th Cir. 1987) (stating that an argument made without citation to authority is insufficient to raise an issue before the court).

Furthermore, based upon his brief, the Administrator does not even attempt to challenge the constitutionality of COP Nunn's individual conduct from any perspective other than in her role as an investigator. Therefore, COB's Motion is **GRANTED** on the individual liability portion of count V.

### 3. Officers Hastings, Oldham, Roberts, and Wilson

The remaining claim for the court to analyze on summary judgment is count XI

24

for excessive force.  This claim is asserted against all the Officer Defendants, *i.e.*, Officers Hastings, Oldham, Rogers, and Wilson and Officer Everett,[16] in their individual capacities.  Taking the facts in a light most favorable to the Administrator, in sum the excessive force claim stems from the Officer Defendants' use of a Taser on Mr. Patrick, a mentally disturbed patient, multiple times even though he did not violently fight against being returned to UAB Hospital, but instead only passively resisted, and despite the fact that Mr. Patrick showed signs that he was suffering from excited delirium or sudden death syndrome, which conditions the Office Defendants acknowledge are part of Taser training.[17]

In support of this excessive force claim, the Administrator relies upon an expert witness, Philip P. Hayden, Ed.D, a former Supervisory Special Agent with the Federal Bureau of Investigation, who has opined that the Officer Defendants' multiple use of Taser guns against a "passive resister" like Mr. Patrick, who was showing signs of excited delirium or sudden death syndrome, was in violation of their training on the

---

[16] As mentioned above in the introduction, Officer Everett separately filed his own summary judgment motion.

[17] As observed in *Oliver v. City of Orlando*, 574 F. Supp. 2d 1279, 1284 n.8 (M.D. Fla. 2008),"[a]n officer may be held liable under § 1983 even if his involvement was purely passive because police officers have 'a duty to intervene when another officer uses excessive force.'" (quoting *Byrd v. Clark*, 783 F.2d 1002, 1007 (11th Cir. 1986)), *aff'd*, 586 F.3d 898 (11th Cir. 2009).

standards applicable to the deployment of such weapons. (*See generally* Doc. 116-49 at 1-5). While Officer Hastings, Oldham, Roberts, and Wilson have acknowledged this expert opinion offered by the Administrator to counter summary judgment, they have suggested that the court should simply disregard the declaration because it is not evidence, "but merely an opinion."   (Doc. 117 at 4 ¶ 23).

However, they cite to no authority for this proposition and have not filed any motion in limine regarding this proof.  Additionally, the court is unaware of a blanket prohibition against the use of expert testimony in excessive force cases, and, to the contrary, has found two published Eleventh Circuit opinions in which the district court's decision to admit testimony on the prevailing standards in the field of law enforcement from an "use of force" witness at trial was upheld. *See, e.g., Samples v. City of Atlanta*, 916 F.2d 1548, 1551 (11th Cir. 1990) ("We find, however, that the questions leading up to this testimony, and the manner in which the expert answered the question, properly informed the jury that the expert was testifying regarding prevailing standards in the field of law enforcement."); *United States. v. Myers*, 972 F.2d 1566, 1577 (11th Cir. 1992) ("In light of the questioning and answers given, we find that, as with the testimony in *Samples*, Baker properly framed his opinion in accordance with prevailing police standards.").  Against this backdrop, the court turns to an assessment of the Office Defendants' qualified immunity defense to the

Administrator's excessive force count.

### a.    Constitutional Inquiry

In *Oliver v. Fiorino*, 586 F.3d 898 (11th Cir. 2009), a civil rights lawsuit also involving the use of Tasers that culminated in death, the Eleventh Circuit set forth the general standards governing an excessive force claim:

> The complaint says that Officers Burk and Fiorino used excessive and unreasonable force in violation of the Fourth Amendment when they shocked Oliver with a Taser at least eight, and as many as eleven or twelve times over a two-minute span, eventually causing his death. The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the right to be free from excessive force during the course of a criminal apprehension. *Graham v. Connor*, 490 U.S. 386, 394–95, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989); *Mercado v. City of Orlando*, 407 F.3d 1152, 1156 (11th Cir.2005). We analyze a claim of excessive force under the Fourth Amendment's "objective reasonableness" standard. *Graham*, 490 U.S. at 388, 109 S.Ct. 1865. In order to determine whether the use of force is "objectively reasonable," we carefully balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests" against "the countervailing governmental interests at stake" under the facts of the particular case. *Id.* at 396, 109 S. Ct. 1865 (internal citations and quotations omitted). We measure the quantum of force employed against these factors—the severity of the crime at issue; whether the suspect poses an immediate threat to the safety of the officers or others; and whether the suspect actively resisted arrest or attempted to evade arrest by flight. *Lee*, 284 F.3d at 1197–98. Notably, we consider the officers' actions "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," *Kesinger ex rel. Estate of Kesinger v. Herrington*, 381 F.3d 1243, 1249 (11th Cir. 2004), recognizing that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the

amount of force that is  necessary in a particular situation." *Graham*, 490 U.S. at 396–97, 109 S. Ct. 1865.

*Oliver*, 586 F.3d at 905-06 (emphasis added).

In *Oliver*, the Eleventh Circuit also summarized a prior Taser shock case that

was decided in 2004, prior to the death of Mr. Patrick:

> In *Draper v. Reynolds*, we addressed the use of a Taser shock in the course of an arrest.  369 F.3d at 1270.  In that case, we concluded that where the police had used <u>a single Taser shock against a "hostile, belligerent, and uncooperative" suspect, not causing any serious injury and leaving the suspect "coherent" and "calmed" shortly after the shock,</u> the force used was proportionate and reasonable.  *Id.* at 1278. We observed that under the facts of the case, "the single use of the [T]aser gun may well have prevented a physical struggle and serious harm to either [the suspect] or [the officer]," and, therefore, "[u]nder the 'totality of the circumstances,' [the officer's] use of the [T]aser gun did not constitute excessive force."  *Id.*

*Oliver*, 586 F.3d at 906 (emphasis added).  Thus, in *Draper*, a single Taser shock on

an unruly and hostile plaintiff with a minimal amount of resulting harm did not

constitute excessive force.

In deciding that the plaintiff in *Oliver* (unlike the one in *Draper*) had

established a viable excessive force claim, the Eleventh Circuit reasoned:

> <u>The justification for the repeated use of Taser force, at least beyond an initial Taser shock, was minimal.</u> <u>The plaintiff was not accused of or suspected of any crime, and indeed was not threatened with arrest or apprehension at any time prior to (or after) the use of force.</u> The plaintiff posed no immediate threat of danger to officers beyond the moment of struggle with Officer Burk. He did not act

28

belligerently toward the police officers, and he did not curse or yell at them. In fact, <u>he was largely compliant and cooperative</u> with the officers—moving away from their vehicle when instructed, stopping and talking the first time he was requested to do so (even though not threatened with detainment), stopping when instructed, providing requested identification, and only attempting to disregard the officer and walk away when the officer attempted a "custodial touch" on Oliver's shoulder.

     <u>Moreover, the plaintiff did not pose a grave danger to others.</u> While Oliver did stop in the street and may have attempted to cross the street against the light, viewing the facts in a light most favorable to Oliver, we may infer that Oliver was within the lane that was boxed in by the police cars, and thus not exposed to traffic during the incident. This inference is supported by Officer Burk's statement that the entire incident occurred in "the safe area," that "none of this incident took place in the middle of the intersection," and that he did not recall any traffic passing by, honking, or almost striking him or Oliver during the incident. <u>Finally, Oliver was not actively resisting arrest nor attempting to evade arrest by flight.</u>

     Quite simply, though the initial use of force (a single Taser shock) may have been justified, the repeated tasering of Oliver into and beyond his complete physical capitulation was grossly disproportionate to any threat posed and unreasonable under the circumstances.

*Oliver*, 586 F.3d at 906-07 (emphasis added).

Comparing the facts of this case to those of *Oliver* and *Draper*, the court finds, similar to *Oliver*, that the Office Defendants' firing the Taser on Mr. Patrick multiple times (eighteen shots over a period of less than eleven minutes), given his non-threatening behavior and at best only passive efforts at resistance, coupled with the known risks associated with using a Taser when a person shows signs of excited

delirium or sudden death syndrome (which Mr. Patrick was undisputably exhibiting), "was grossly disproportionate to any threat posed and unreasonable under the circumstances." *Oliver*, 586 F.3d at 907. The court's conclusion that the Officer Defendants committed a constitutional violation is bolstered by the Administrator's expert evidence indicating that the challenged police action violated law enforcement standards governing the use of Tasers.

**b.    Clearly Established Law Inquiry**

Regarding clearly established law, the Eleventh Circuit in *Oliver* determined that the officers there violated that qualified immunity component under the so-called "obvious clarity" test:

> In order to determine whether a right is clearly established, we look to the precedent of the Supreme Court of the United States, this Court's precedent, and the pertinent state's supreme court precedent, interpreting and applying the law in similar circumstances. *McClish v. Nugent*, 483 F.3d 1231, 1237 (11th Cir. 2007). "We have said many times that 'if case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant.'" *Priester v. City of Riviera Beach, Fla.*, 208 F.3d 919, 926 (11th Cir. 2000) (quoting *Smith v. Mattox*, 127 F.3d 1416, 1419 (11th Cir.1997)). However, in some cases, we may find that the right is clearly established, even in the absence of case law. <u>One such instance is where the case is one of "obvious clarity"—*i.e.*, where the office's conduct "lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to [the official], notwithstanding the lack of fact-specific case law" on point.</u> *Vinyard v. Wilson*, 311 F.3d 1340, 1355 (11th Cir.2002) (quoting *Lee*, 284 F.3d at 1199). Under this test, "the law is clearly established, and qualified

30

immunity can be overcome, only if the standards set forth in Graham and our own case law inevitably lead every reasonable officer in [the defendant's] position to conclude the force was unlawful." *Lee*, 284 F.3d at 1199 (internal quotation marks omitted).

No decision from the United States Supreme Court, or from this Court, or from the Florida Supreme Court, has clearly established that an officer's repeated use of a Taser constituted excessive force under circumstances like these. Indeed, neither the United States Supreme Court nor the Florida Supreme Court has even addressed the use of Tasers in an excessive force inquiry, and this Court has only squarely done so in one published decision, *Draper v. Reynolds*, 369 F.3d at 1270, which, as we have said, is not directly on all fours with this case. <u>The question then boils down to this: whether it would be clear to every reasonable officer, even in the absence of case law, that the force used—repeatedly tasering Oliver over a two-minute period without warning—was excessive under the circumstances.</u>

We agree with the district court"s determination that the force employed was so utterly disproportionate to the level of force reasonably necessary that any reasonable officer would have recognized that his actions were unlawful. The need for force was exceedingly limited. <u>Again, Oliver was not accused of or suspected of any crime, let alone a violent one; he did not act belligerently or aggressively; he complied with most of the officers' directions; and he made no effort to flee.</u>

*Oliver*, 586 F.3d at 907-08 (emphasis added).

The Administrator has video evidence which captures a partial picture of the circumstances surrounding the tasing of Mr. Patrick. (Doc. 116 at Ex. H (not accessible on CM/ECF, but the evidence is on file with the clerk)). The court has watched these video clips and based upon this visual proof as well as the undisputed evidence that Mr. Patrick was not accused or suspected of any criminal conduct and

31

was showing signs of excited delirium or sudden death syndrome (conditions as to

which the Officer Defendants had received training cautioning against Taser use),

finds, comparable to *Oliver*, that "any reasonable officer would have recognized that

his actions [*i.e.*, multiple tasing of Mr. Patrick] were unlawful."  586 F.3d at 908.

Alternatively, the court concludes that "there are facts that are inconsistent with

qualified immunity being granted [on summary judgment as to excessive force and

that, accordingly,] the case and the qualified immunity issue along with it [should]

proceed to trial."[18]  *Johnson v. Breeden*, 280 F.3d 1308, 1317 (11th Cir. 2002).

---

[18]  For example, Ms. Jordan testified that at some point she "was trying to back out because the police were surrounding [Mr. Patrick], and he just slung them like they were rag dolls."  (Doc. 110-4 at 4 at 16).  When Ms. Jordan observed this in relationship to the decision to tase Mr. Patrick is unclear from the record, although the Officer Defendants' version of events seems to suggest that this occurred <u>after</u> they had escalated this situation by using the Taser on Mr. Patrick.  (Doc. 110 at 9 ¶ 18).  Additionally, if this is the correct chronology, then the Taser video evidence does not substantiate Ms. Jordan's rag doll recollection.  Also, in contrast to Ms. Jordan's testimony, other medical personnel on the scene have indicated that they never "were scared of Mr. Patrick at any time."  (Doc. 116-64 at 4 ¶ 12; Doc. 116-65 at 4 ¶ 13).

Another materially disputed fact involves Mr. Patrick's attempted use of scissors as a weapon, which is discussed more fully in § IV.D immediately below.

Additionally, the record's overall lack of clarity concerning the chronology of events before, during, and after the multiple instances of tasing endured by Mr. Patrick clouds the court's ability to reach a resolution of the Officer Defendants' qualified immunity defense to excessive force on summary judgment without engaging in improper speculation about when key facts occurred.

Therefore, for all these reasons, COB's Motion is **DENIED** with respect to the excessive force count alleged against Officers Hastings, Oldham, Roberts, and Wilson.

### C.    Officer Everett's Motion

Officer Everett's Motion is substantially similar in content to the COB's Motion.  Therefore, in light of the above analysis, the court similarly concludes that Officer Everett's Motion is **GRANTED** on all remaining counts involving him, with the exception of the Administrator's claim of excessive force asserted against him individually as set forth in count XI of the second amended complaint.

Relatedly, Officer Everett's Motion is also **DENIED** to the extent that it seeks summary judgment on the Administrator's punitive damages claim because that is the only type of damage which the Administrator can recover against an individual defendant in a § 1983 excessive force action brought on behalf of a decedent.  *See, e.g., Weeks v. Benton*, 649 F. Supp. 1297, 1303 (S.D. Ala. 1297) ("This statute has been interpreted to authorize the recovery only of punitive damages.  Thus, the application of the Alabama wrongful death statute to § 1983 actions through § 1988 would normally [*i.e.*, when individual defendants are involved] limit recoverable damages to punitive damages only.") (citations omitted).

### D.    Administrator's Strike Motion

The Administrator's Strike Motion seeks to strike language from the reply briefs offered in support of COB's Motion and Officer Everett's Motion on the basis that such facts were not asserted in the initial briefs and are improperly raised for the first time on reply.   While Officer Everett did not file a response to the Administrator's Strike Motion, the other remaining Officer Defendants did.  (Doc. 122).

Under Appendix II of the court's uniform initial order, "[t]he moving party shall list in separately numbered paragraphs each material fact the movant contends is true and not in genuine dispute, and upon which the moving party relies to demonstrate that it is entitled to summary judgment."  (Doc. 5 at 16 (emphasis omitted)).  Additionally, "[t]he reply submission, if any, shall consist of only the moving party's disputes, if any, with the non-moving party's additional claimed undisputed facts."  (*Id.* at 18).  Finally, "[e]ach statement of fact should be supported by its own evidentiary citation, regardless of the fact that more than one statement of fact allegedly is supported by the same specific reference to the evidentiary record or more than one statement of fact is contained in the same numbered paragraph."  (*Id.* at 17 n.3).

The Administrator first objects to the reference in the reply briefs that Mr.

Patrick attempted to use a pair of scissors as a weapon.  (Doc. 121 ¶ 2).  In

opposition, Defendants contend that they offer this fact in response to the

Administrator's position that "[t]here is no evidence that Patrick was a threat to the

public."  (Doc. 115 at 6 ¶ 11).

Defendants also indicate that the statements made in paragraphs 17 and 20 of

the initial brief in support of the COB's Motion are sufficient to allow the court to

consider Mr. Patrick's attempted use of scissors as a weapon as a fact for purposes

of summary judgment.

The court disagrees.  Paragraph 17 states that:

> One UAB nurse was trying to assist with Patrick, and that is when
> Patrick grabbed the nurse's scissors and refused to let go.  Ms. Jordan
> stated they were finally able wrestle the scissors away from Patrick's
> hands.

(Doc. 110 at 8-9 ¶ 17).  Paragraph 20 makes no mention of the scissors.

Finally, the evidentiary citations  upon which Defendants rely (Doc. 122 at 2-3

¶ 4) do not unanimously confirm that Mr. Patrick attempted to use the scissors as a

weapon.  (*See* Doc. 110-4 (Elisa Jordan Depo.) at 4 at 11 (no reference to Mr.

Patrick's use of scissors as a weapon); Doc. 110-5 (Captain Tingle Depo.) at 9-10 at

32-33 (same); *cf.* Doc. 110-7 (Office Wilson Depo.) at 6 at 19 (describing Mr.

Patrick's being "in a kind of fighting position to ward off anybody that was going to

come near him . . . .")).

In fact, Captain Tingle's testimony indicates that the scissors grabbed by Mr. Patrick  were bandage ones as opposed to pointed surgical scissors.  (Doc. 110-5 at 10 at 33).  Other witnesses, like Ms. Jordan and Officer Everett, were unsure if Mr. Patrick ever even got possession of the scissors.  (Doc. 110-4 at 6 at 22 ("Well, he might not have got them [*i.e.*, the scissors], but I know he was reaching for them. That's all I know."); (Doc. 110-2 at 6 at 19 ("I remember somebody else yelling he's going for the scissors or he's got my scissors . . . I don't know if he ever did actually have them.")).

Still other witnesses, like nurses Brandy Creel and Sonya Skinner, affirmatively state that they never saw Mr. Patrick holding any scissors.  (Doc. 116-64 at 4 ¶ 12; Doc. 116-65 at 4 ¶ 13).   Therefore, even if the evidence is not appropriately procedurally barred by non-compliance with Appendix II, from a substantive standpoint, the proof pointed to by Defendants does not undisputedly establish that Mr. Patrick attempted to use scissors as a weapon.  Accordingly, for all these reasons, the first portion of the Administrator's Strike Motion is **GRANTED**.

Regarding the second part of the Strike Motion, the Administrator challenges Defendants' factual position that, based upon the number of puncture wounds  found on Mr. Patrick's body, the Officer Defendants only effectively used the Taser on Mr.

Patrick twice.  (Doc. 121 ¶ 3).  Defendants maintain that they offer this evidence to

refute the Administrator's summary of the Taser usage data totaling 18 fires at Mr.

Patrick.  (Doc. 122 ¶ 3; *see also* Doc. 115 at 7 ¶ 21 ).

Defendants also rely on paragraph 20 of their initial brief to show that they are

not stating any new facts in this area as part of their reply.  Paragraph 20 provides:

> On August 3, 2007, Dr. Robert M. Brassie, M.D. is the Chief
> Coroner/Medical Examiner for the Jefferson County, Alabama
> performed an autopsy on Clyde.  Dr. Brassie testified in his deposition
> that the cause of death of Clyde as probably arrhythmia secondary to
> dilated cardiomyopothy (enlarged heart) due to all events occurring at the
> scene that day. (Brassie deposition, p.45, 126, (Morrow Deposition,
> Plaintiff's Exh. 7).  Dr. Brassie testified that no asphyxiation or
> positional asphyxiation of Clyde took place. (Brassie deposition pg.
> 125).

(Doc. 110 at 9-10 ¶ 20).  Thus, paragraph 20 makes no mention of Robert M. Brissie,

M.D.'s ("Dr. Brissie")[19] testimony relating to Tasers or Taser puncture wounds found

on Mr. Patrick's body, and these facts stated in reply are newly stated ones.

Additionally, the facts offered by Defendants relating to Taser puncture

wounds do not dispute that 18 shots were fired at Mr. Patrick.  Finally, even if Dr.

Brissie's testimony can be read, as Defendants maintain, to conclusively confirm that

---

[19]   The deposition transcript reflects the correct spelling to be "Brissie" as
opposed to "Brassie". (Doc. 110-10 at 2 at 1).  Dr. Brissie "was the division head for
the forensic pathology division and chief coroner and medical examiner of Jefferson
County" in August 2007.  (Doc. 110-10 at 4 at 9).

the 18 fires from the weapons only resulted in five puncture wounds and two fully functioning Taser shots, they still have not shown through Dr. Brissie's opinion testimony that the pain endured by Mr. Patrick was, as a result, merely minimal (*see* Doc. 110-10 at 33 at  125 ("And I think he received tasers, and I think that would be painful and cause release of epinephrine [*i.e.*, adrenaline], norepinephrine.")) or that Taser use was medically unrelated to Mr. Patrick's death.  (*See* Doc. 116-8 at 2 at 0001 (listing "**CAUSE OF DEATH**" as "Probable arrhythmia secondary to dilated cardiomyopathy"; "**MANNER OF DEATH**" as "Homicide" and "**CONTRIBUTORY**" as "Taser use")).  Accordingly, for all these reasons, the second section of the Administrator's Strike Motion is also **GRANTED**.

## V.   CONCLUSION

Thus, based upon the foregoing analysis, COB's Motion is **GRANTED IN PART** and **DENIED IN PART**, Officer Everett's Motion is **GRANTED IN PART** and **DENIED IN PART**, and Plaintiff's Strike Motion is **GRANTED**.  Accordingly, counts IV, V, VI, and X of the Administrator's second amended complaint are **HEREBY DISMISSED WITH PREJUDICE**.  By separate order, the court will set the sole surviving count XI, *i.e.*, the Administrator's excessive force claim against the Officer Defendants in their individual capacities, for a pretrial conference.

**DONE** and **ORDERED** this the 29th day of August, 2012.

**VIRGINIA EMERSON HOPKINS**
United States District Judge